**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SEAN P. McGOVERN, ⟩ | |
| ⟩ | Civil Action No.: 98-cv-5186 (JLL) |
| ⟩ | |
| Plaintiff, ⟩ | |
| v. ⟩ | |
| ⟩ | **OPINION** |
| ⟩ | |
| CITY OF JERSEY CITY, et al., ⟩ | |
| ⟩ | |
| Defendants. ⟩ | |

**LINARES**, District Judge.

### INTRODUCTION

This matter is presently before the Court on motions by Defendants City of Jersey City, the Jersey City Police Department, William Thyne, Michael Morriaty, Tim Legowski, James Kelly, Kenneth Petrovcik, Dennis Long, Thomas Leach, James Halter, Edward Myers, Jr., Peter Nalbach, Mark Hussey, James Sharrock, James Blake, Vincent Disbrow, (collectively, the "Jersey City Defendants"), Hudson County, Hudson County Sheriff's Office, Joseph Cassidy (collectively, the "Hudson County Defendants"),[1] Louis Karras, James Sharrock, and John Courtney & Anthony Courtney Partnership d/b/a/ New Park Tavern, (collectively, the "Park Tavern Defendants"), pursuant to Federal Rule of Civil Procedure 56 on Plaintiff Sean P. McGovern's claims for (i) violations of his rights under the First, Fourth and Fourteenth Amendments of the United States Constitution, brought pursuant to 42 U.S.C. § 1983; (ii) violations of his rights under the New Jersey Constitution; (iii) negligence; (iv) intentional

---

[1]The Jersey City Defendants have filed a joint motion for summary judgment. The Hudson County Defendants filed jointly for summary judgment, as well.

infliction of emotional distress; and (v) civil conspiracy.  This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1331.  Oral argument was previously heard in this matter.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a Sheriff's Officer with the Hudson County Sheriff's Office ("HCSO"). Hudson County (hereinafter the "County") is a unit of local government authorized under Title 40A of the New Jersey Statutes.  The HCSO is an office within the County.  Joseph Cassidy is the duly elected Sheriff of Hudson County.  James Sharrock was appointed by Joseph Cassidy to act as Undersheriff of Hudson County as of early 1999.[2]  The City of Jersey City (hereinafter "Jersey City") is a local unit of government authorized under Title 40A of the New Jersey Statutes. The Jersey City Police Department ("JCPD") is a department of law enforcement within Jersey City. William Tyhnne was the Chief of Police for the JCPD.  Michael Moriarty was the Police Director for the JCPD.  The following Defendants were employed at all times relevant to this matter, as law enforcement officers with the JCPD: Richard Garrison, Vincent Corso, Steve Trowbridge, Patricia Cassidy, Tim Legowski, Louis Karras, Kenneth Petrovcik, James Kelly, Dennis Long, Thomas Leach, James Halter, Edward Myers, Jr., Victor Perez, Peter Nalbach, Nark Hussy, James Blake, Vincent Disbrow, and John Does 1 through 6 and 11 through 15.  John & Anthony Courtney Partnership d/b/a/ New Park Tavern ("Park Tavern") operated a tavern and restaurant facility, located on 575-577 Westside Avenue, in Jersey City, New Jersey.

---

[2]Prior to his appointment as Undersheriff of Hudson County, Defendant Sharrock was employed as a law enforcement officer with the JCPD.  By stipulation dated June 10, 2005, Plaintiff's claims were dismissed against Defendant James Sharrock in his capacity as Undersheriff of Hudson County.  As Sharrock's pending motion for summary judgment relates solely to his actions as Undersheriff of Hudson County, the motion is deemed moot.

*The Jersey City Defendants*

The events giving rise to this action occurred on November 27, 1997.  The evening began with an informal reunion of alumni of the St. Peter's Preparatory School, in Jersey City, New Jersey.  The event is called "Jug-Night."  The venue was the Park Tavern.  That evening, the bar was managed by Robert Courtney, who is John Courtney's son and was also employed in the capacity of bartender.  "Jug-Night" typically includes non-alumni attendees, and has included significant off-duty law enforcement attendance.  Plaintiff arrived at the Park Tavern at approximately 9:00 p.m.  The Park Tavern was very crowded that evening.  Attendance has been described as "shoulder to shoulder."  (Plaintiff's Counter Statement of Material Facts (hereinafter "PCSF"),  ¶ 14).  Off-duty sheriff's officers and police officers were in attendance that evening.   Defendants Corso, Garrison, Kenny and Trowbridge, who were off-duty JCPD officers, were all present at the Park Tavern.  Defendant Garrison arrived at Park Tavern between approximately 10:00 and 10:30 p.m.  While there, Defendant Garrison consumed about three alcoholic beverages.  Plaintiff consumed about four alcoholic beverages.

Plaintiff remained at the Park Tavern for approximately two hours.  At approximately 11:30 p.m., Plaintiff walked outside.  He remained in front of the bar for about one half hour.  He then proceeded to walk an acquaintance home.  At the destination, he encountered two female friends, Lauren Scarpa and Lauren Begley, who drove Plaintiff back to the bar.  Plaintiff returned to the Park Tavern between 1:45 and 2:00 a.m.  It was now near closing time, and the doors were locked.  Plaintiff's two friends were allowed access to the bar to look for another friend, while Plaintiff remained outside on the sidewalk near the front entrance.  Patrons were leaving the bar, which was in the process of closing for the evening.  Defendant Garrison, whom Plaintiff had met earlier that evening, exited the Park Tavern through the front entrance,

accompanied by his girlfriend, Denise Shubert.  Apparently, Plaintiff and Shubert may have had a previous relationship.  Shubert and Defendant Garrison were followed by Defendants Corso and Deitrich.  Evidently, words were exchanged between Plaintiff and Defendant Garrison. Defendant Garrison began to approach Plaintiff, but was held back by other individuals. Plaintiff identified himself as a sheriff's officer.  Next, Defendant Garrison reached over and struck Plaintiff over his left eye.

During the altercation that followed, Defendant Garrison and Plaintiff fell to the sidewalk.  Defendant Garrison pulled Plaintiff forward and bit his nose.  Plaintiff claims that he was then assaulted by Defendants Garrison, Deitrich, Corso and a fourth unknown person.  The individuals, according to Plaintiff, dragged him to the ground, then kicked him multiple times. Around this time, Plaintiff's brother, Brian McGovern, was still in the bar.  He was notified, and immediately went outside.  Brian, who held a black belt in karate, came to his brother's aid. Brian struck Plaintiff's assailants.  Brian then assisted Plaintiff in getting up from the ground.

The JCPD dispatch records indicate that at 2:21 a.m., the patrol car assigned to Defendants Legowski and Petrovcik called in a street fight pertaining to West Side Avenue and Clinton Street, in Jersey City.  The records reveals that their patrol was dispatched to said location and remained at the scene until 3:05 a.m.  JCPD dispatch records also reveal that the patrol car assigned to Defendants Karras and Kelly was dispatched to Clinton and Westside Avenues at 2:32 a.m., and remained on the scene until 3:03 a.m.  JCPD records also reveal that the patrol assigned to Defendants Long and Leach was also sent to the scene at 2:22 a.m. Additionally, the patrol car assigned to Defendants Halter and Meyers was dispatched around the same time.

According to Plaintiff, Defendants Kenny and Trowbridge identified themselves as police officers.  Plaintiff claims that he was then placed under arrest by Defendant Kenny. Defendants Kenny and Trowbridge allegedly pulled Plaintiff's arms behind his back, and pinned him to the ground with his arms underneath him.  While on the ground, Plaintiff was allegedly struck in the mouth, which resulted in chipping and damage to his teeth.  Lauren Scarpa testified that while Plaintiff was still on the ground, he was kicked by several other men.  (PCSF ¶ 85; Loftis Cert. Ex. A-27 at 25-26).  Eventually, Defendant Karras pulled the others off of Plaintiff. By this point, there was blood on Plaintiff's face.

Plaintiff was then taken by Defendant Karras into the adjacent Park Tavern parking lot, and placed against a patrol car.  Defendant Garrison then approached Plaintiff.  According to Plaintiff, Defendant Garrison held Plaintiff against the wall while asking Plaintiff not to pursue any charges against him.  (Loftis Cert. Ex. A-30 at 119).  Defendant Patricia Cassidy, who was off-duty at the time, allegedly approached Plaintiff and Defendant Garrison.  Defendant Garrison left.  Defendant Patricia Cassidy then pulled Plaintiff further into the lot.  According to Plaintiff, she then allegedly threatened him in an effort to dissuade him from pursuing any charges in connection with the aforementioned incidents.  (PCSF ¶ 111).

Meanwhile, Defendants Legowski and Petrovcik had arrived on the scene.  They observed that Brian McGovern was not wearing a shirt and he was screaming.  Defendant Legowski handcuffed Brian McGovern and placed him in the back seat of a patrol car.   Edward McGovern, Plaintiff's cousin and also a sheriff's officer, was driving past the Park Tavern when he observed Brian McGovern in the back seat of the patrol car.  Edward McGovern asked Defendant Karras whether his cousins were being charged and was told that they were not.  After being released from handcuffs, Brian McGovern asked Defendants Karras and Legowski for an

ambulance for Plaintiff, and was told to take him to the emergency room.  Edward, accompanied by Brian, drove Plaintiff to St. Francis Hospital, in Jersey City.  Plaintiff arrived at the emergency room at approximately 3:00 a.m.

While at the hospital, Plaintiff placed a call to the JCPD at approximately 3:20 a.m. to request that a supervisor go to the hospital so that Plaintiff could report what happened earlier that evening.  According to the transcript of JCPD recorded telephone calls, at around 3:50 a.m., Defendant Perez, the Deputy Chief in Charge of Operations for Jersey City, indicated that he would be responding to Plaintiff's call at St. Francis.  (Loftis Cert. Ex. B-14 at 24).  Soon thereafter, Plaintiff was visited by Defendant Hussy, a patrol Lieutenant with the JCPD, and then by Defendant Perez.  JCPD recorded transmissions further reveal that at approximately 4:33 a.m., Defendant Perez spoke to Defendant Nalbach, the Captain in charge of the Internal Affairs Unit, and stated that Plaintiff "got his nose bit off, [and] he lost several teeth, so you come in and investigate this."  (Loftis Cert. Ex. B-14 at 37).  Perez further states, "they stomped on his face and ... he lost several teeth."  (Id.).  Nolan and Defendant Nalbach checked Plaintiff's breath and hands.  They found no markings and did not smell alcohol on his breath.  Defendant Nalbach told Defendant Perez that Plaintiff's "hands are clear" and they "look like model's hands." (Loftis Cert. Ex. B-14 at 69-70).  In the same conversation, Defendant Perez asked, "Well, did he say who bit him on the nose?'" (Id.).  Defendant Nalbach responded, "Garrison."  (Id.).

During the course of the night, the following JCPD officers were at the hospital at various points while Plaintiff was being treated: JCPD Officers Bender and Mullins, as well as Defendants Perez and Hussey, Defendant Nalbach and Defendant Sharrock, at the time, the Night Detective Commander for the City of Jersey City.  (PCSF ¶ 145).  Also in attendance at St. Francis was Lieutenant Christopher J. Nolan of the HCSO Internal Affairs Unit, and Defendant

Cassidy.  A PD-500 form is utilized by the JCPD in connections with complaints against officers based on their conduct or behavior.  Defendant Hussey accepted the PD-500 form regarding Plaintiff at 3:50 a.m.

Defendant Karras took a verbal statement from Defendant Garrison.  In his report, Defendant Karras did not mention that Defendant Patricia Cassidy had been present, nor does he mention any of the actions of Defendant Corso or any officers present that night.  (Loftis Cert. Ex. B-7).  At approximately 4:57 a.m., Defendant Karras requested an ambulance for "an injured off-duty P.O."  (Loftis Cert. Ex. B-14 at 62).  At approximately 5:02 a.m., a Jersey City Medical Services Emergency Medical Unit ("EMS") was dispatched for purposes of examining Defendant Garrison.  The EMS records show that Defendant Garrison was in no distress and declined to go the hospital.  Further, he exhibited a little swelling on both sides of his head, but indicated that he felt "o.k."  (Loftis Cert. Ex. B-18).

Plaintiff was discharged from the emergency room at approximately 5:30 a.m.  The injuries allegedly sustained include seven fractured teeth, lacerations above his left eye, a septal fracture, as well as a swollen face, and bruises to the leg and body.  He proceeded to the location of the JCPD Internal Affairs Unit.  There, a single Polaroid picture was taken of Plaintiff's injuries.  (Loftis Cert. Ex. B-21).  However, the picture is very unclear and out of focus.  (Id.).  While there, Plaintiff was advised to view photos of JCPD officers so that he could identify his assailants.  According to Plaintiff, he was provided old and outdated photos, depicting officers with shaved heads wearing police academy uniforms.

On the night of November 27, 1997, JCPD Internal Affairs did not interview Defendant Garrison.  Further, Defendant Blake, a JCPD Internal Affairs Lieutenant, did not interview anyone, took no statements and questioned no one concerning the reports that were filed.

However, HCSO Lieutenant Nolan interviewed Garrison on Thanksgiving morning, November 27, 1997, between 7:00 and 7:20 a.m.  His notes indicate that present during the statement were Defendants Garrison, Blake, Disbrow, and Patricia Cassidy.  (Loftis Cert. Ex. B-19).  Lieutenant Nolan spoke to Plaintiff at 9:30 a.m., and noted that Plaintiff "intends to pursue matters fully." (Id.).  Additionally, he notes that Plaintiff called back at 11:30 a.m., to indicate that he was returning to St. Francis Hospital based on a re-diagnosis of a "broken nose and eye socket." (Loftis Cert. Ex. B-19).

Defendant Perez testified that he prepared a report concerning the events of November 27, 1997 and left the report along with the records for Defendant Thynne, JCPD Chief of Police, to review the next day.  However, Defendant Perez did not recall speaking to Defendant Thyme about the incident.  (Loftis Cert. Ex. A-45 at 17-18).  Defendant Thynne also did not recall speaking to Defendant Perez.  (Id. Ex. 44).  No report written by Defendants Perez, Sharrock or Disbrow has been produced despite an April 1998 Preservation Order entered in the New Jersey Superior Court, Hudson County.  (Loftis Cert. Ex. B-27).  Additionally, since 1995, the JCPD requires officers to file reports in instances whether force was used on-duty or off-duty.  (PCSF ¶ 223).  No such report was completed by any officers who were present at the Park Tavern.

The JCPD did not initiate any criminal charges against Defendant Garrison, or any other person in connection with the events at the Park Tavern on the night of November 27, 1997.  In January 1998, Defendant Nalbach referred the matter to the Hudson County Prosecutor for presentation to the Grand Jury.  Thereafter, on March 9, 1998, Plaintiff signed a criminal complaint charging aggravated assault against Defendant Garrison, who in turn signed complaints against Plaintiff and Brian McGovern.  Instead of presenting the matter to the Grand Jury, the Hudson County Prosecutor downgraded the matter to a simple assault and referred it to

the Hoboken, New Jersey, Municipal Court for treatment as a disorderly person's offense. On March 3, 2000, both Plaintiff and Defendant Garrison appeared in the Hoboken Municipal Court with counsel, and voluntarily dismissed their complaints.

### Hudson County Defendants

Plaintiff alleges that since the incident at the Park Tavern, he has been the subject of retaliation while employed at the HCSO. Plaintiff claims that he was not being provided overtime pursuant to the instruction of Defendant Cassidy. (PCSF ¶ 287-88). Additionally, Plaintiff charges that Defendant Cassidy called Plaintiff a "rat" during a February 1999 roll call at the HCSO. (PCSF ¶¶ 305-307). Plaintiff further charges that Defendant Cassidy has required that Plaintiff make a written request for transfer to a different post within the Court Bureau Unit of the HCSO. Plaintiff alleges that no other officers are required submit a written request for a transfer. (PCSF ¶¶ 314-16).

Plaintiff further explains that his participation in the pension plan was terminated, effective November 1997. (PCSF ¶ 333). It was reinstated in July 2000. Additionally, Plaintiff contends that he was omitted from participation in the parity grievance, wherein an employee may seek a wage increase in order to be placed on parity with other officers based on longevity of employment. Defendants respond that three people were inadvertently omitted from the list, and that all three received the compensation they were entitled to receive.

### Procedural History

Plaintiff commenced the instant action on November 16, 1998. By consent Order entered June 17, 2002, Plaintiff dismissed all claims as to the City of Bayonne, Bayonne Police Department ("BPD"), Frank Pawlowski, the BDP Chief of Police, and Eric Deitrich. On February 11, 2003, Plaintiff filed a Third Amended Complaint. Thereafter, five separate

motions for summary judgment were filed.  The motions were submitted on behalf the Jersey City Defendants, the Hudson County Defendants, the Park Tavern Defendants, Defendant Sharrock, and Defendant Karras.  Oral argument on the motions for summary judgment was heard on July 21, 2005.

## LEGAL STANDARD

**A.      Summary Judgment Standard**

Fed. R. Civ. P. 56(c) provides for summary judgment when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).  Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985), cert. denied, 475 U.S. 1013 (1986).  In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion.  Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995); Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1413 (3d Cir.), cert. denied, 502 U.S. 941 (1991).

The party opposing the motion for summary judgment cannot rest on mere allegations and must instead present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995); Sound Ship Bldg. Corp. v. Bethlehem Steel Co., 533 F.2d 96, 99 (3d Cir.), cert. denied, 429 U.S. 860 (1976).  A mere "scintilla" of evidence in favor of the non-movant is insufficient to withstand a summary judgment motion.  Liberty

Lobby, 477 U.S. at 252.  Rather, "the determination of whether a given factual dispute requires

submission to a jury must be guided by the substantive evidentiary standards that apply to the

case."  Id. at 255.  The inquiry is whether there is enough evidence so that under the governing

evidentiary standard, a reasonable juror would be able to find for either the plaintiff or the

defendant.  Id.

## LEGAL DISCUSSION

A.      **Section 1983: The Jersey City Defendants**

        In Count One of the Complaint, Plaintiff asserts a claim under 42 U.S.C. § 1983.  Section

1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.  Section 1983 does not create substantive rights; but rather "it provides

remedies for deprivations of rights established elsewhere in the Constitution or federal laws."

Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  A § 1983 claim has two essential

elements: 1) that the conduct complained of was committed by a person acting under the color of

state law; and 2) that the conduct deprived a person of rights, privileges, or immunities secured

by the Constitution or laws of the United States.  Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-

56 (3d Cir. 1994).  A § 1983 plaintiff  must also assert and prove some causal connection

between a defendant and the alleged wrongdoing in order to recover against that defendant.  Mt.

Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Lee-Patterson v. New

Jersey Transit Bus Operations, Inc., 957 F. Supp. 1391, 1401-02 (D.N.J. 1997).  A causal

connection is shown where a defendant (1) participated in violating a plaintiff's rights; (2) directed others to violate them; (3) as the person in charge, had knowledge of and acquiesced in his subordinates' violations; or (4) tolerated past or ongoing misbehavior.  Friedland v. Fauver, 6 F. Supp. 2d 292, 302-03 (D.N.J. 1998).

Additionally, in order to establish a violation of § 1983, there must be actual participation in the civil rights violation by a person acting under the "color of law," before liability can attach.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior."); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976).  In § 1983 actions, courts consider "under color" of law to mean "state action" under the Fourteenth Amendment.  Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982).[3]

Plaintiff asserts claims under § 1983 based on violations of the First, Fourth and Fourteenth Amendments.  It should be noted, however, that the only constitutional claims the Jersey City Defendants have briefed are the Fourteenth Amendment denial of medical attention and access to court claims.  As such, the Court will treat their motion as one for partial summary judgment, and will limit its § 1983 analysis to these claims.[4]

_____

[3]The Jersey City Defendants argue that because the initial assault by Defendant Garrison was not under the color of state law, Plaintiff fails to state a claim under § 1983.  This argument fails. First, there is some dispute as to whether Defendant Garrison identified himself as a police officer prior to allegedly striking Plaintiff over the left eye.  (PCSF ¶¶ 47-48).  Nonetheless, as Plaintiff correctly notes, Defendant Garrison's initial actions are not the sole basis for his claims against the remaining officers and other Defendants.  Plaintiff's claims against the other Defendants cannot be reasonably deemed not to involve state action.

[4]Defendants argue, and Plaintiff concedes that his § 1983 claims against the JCPD should be dismissed because the JCPD is merely an administrative arm of Jersey City.   "In Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police
(continued...)

1.      **Failure to provide medical care**

In Count One of Plaintiff's Third Amended Complaint, Plaintiff alleges that the JCPD

officers on the scene violated his constitutional rights by failing to immediately call an

ambulance following Plaintiff's assault outside the Park Tavern.  In order to succeed in an action

claiming inadequate medical care, a Plaintiff must show that the defendants demonstrated

"deliberate indifference" to a serious medical need.  Durmer v. O'Carroll, 991 F.2d 64, 67 (3d

Cir. 1993) (citations omitted); Boring v. Kozakiewicz, 833 F.2d 468, 471 (3d Cir.1987), cert.

denied, 485 U.S. 991 (1988). In Groman v. Twp. of Manalapan, the Court of Appeals for the

Third Circuit applied the "deliberate indifference" standard to the plaintiff's § 1983 medical care

claim in connection with his post-arrest detention at the police station.  47 F.3d 628 (3rd Cir.

1995).  The Third Circuit stated, "[f]ailure to provide medical care to a person in custody can

rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of

deliberate indifference to that person's serious medical needs."  Groman, 47 F.3d at 637.  "This

standard is in effect a two-pronged test requiring that plaintiff prove: (1) that his medical needs

were 'objectively serious' and (2) that defendant exhibited 'deliberate indifference' to those

needs."  Mantz v. Chain, 239 F. Supp. 2d 486, 504 (D.N.J. 2002) (quoting Monmouth County

Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987)).

Turning to the facts at bar, it is clear that Plaintiff was bleeding after the assault.  The

record reveals that immediately after the assault, Plaintiff was taken into a nearby parking lot by

---

[4](...continued)
department is merely an administrative arm of the local municipality, and is not a separate
judicial entity."  DeBellis v. Kulp, 166 F. Supp. 2d 255, 264 (E.D. Pa. 2001) (collecting cases);
see also Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n. 4 (3d Cir. 1997) (noting, "we treat
the municipality and its police department as a single entity for purposes of section 1983
liability.").  As the JCPD is merely an arm of Jersey City, the Court grants summary judgment to
the JCPD on Plaintiff's § 1983 claim.

Defendant Karras.  At that point, Plaintiff asked if he was under arrest, and was told that he was not.  (Loftis Cert. Ex. A-30 at 50).  Plaintiff admits that he did not request medical attention from the uniformed officers.  (Id. at 50-51).  Plaintiff's cousin, Edward McGovern, arrived on the scene, and asked Defendants Karras and Legowski whether Plaintiff and his brother, Brian, were being arrested.  He was told that they were not.  (Id. Ex. A-29 at 17).  Brian McGovern testified that he asked Defendants Karras and Legowski for an ambulance for Plaintiff, and was told that he should take Plaintiff to the hospital.  (Id. Ex. A-27 at 35).  Plaintiff, Brian and Edward then walked to Edward's van and drove to St. Francis Hospital.  As such, it does not appear to this Court that Plaintiff was in police custody at the time he made the request for medical care.

        Even assuming Plaintiff was in custody, it does not appear that the record demonstrates "deliberate indifference" by the instant Defendants.  The court in Mantz held that the defendant, a state trooper, did not exhibit deliberate indifference to a plaintiff's medical needs, where the trooper refused to immediately call an ambulance following the plaintiff's exposure to pepper spray, and a period of less than hour and a half elapsed between the plaintiff's exposure to the pepper spray and the arrival of ambulance.  Mantz, 239 F. Supp. 2d at 504-05.  Here, the record indicates that not much time elapsed between the time Edward McGovern questioned Defendants Karras and Legowski about an ambulance, and the point at which Plaintiff was driven to the hospital.  Plaintiff does not proffer any evidence that any delay in medical treatment exacerbated his injuries.  See, e.g., Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (a plaintiff "who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed") (citation omitted), abrogation on other grounds recognized by Reece v. Groose, 60 F.3d 487 (8th Cir.1995); see also Langston v. Peters, 100

F.3d 1235, 1241 (7th Cir. 1996) (rejecting allegations of "deliberate indifference" where plaintiff "failed to present any evidence of a detrimental effect caused by the one hour between the time [he] notified [the defendant] and the time [the defendant] notified the medical technician."). Accordingly, this Court grants the moving Jersey City Defendants' motion for summary judgment with respect to that part of Count One in which Plaintiff alleges deliberate indifference to his medical needs.

### 2.       Access to courts

In part of Count One and Count Twelve of Plaintiff's Third Amended Complaint, Plaintiff seeks relief for an alleged denial of access to courts.  "The right of access to the courts ... is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."  Wolff v. McDonnell, 418 U.S. 539, 579 (1974).  As the Third Circuit has recently noted, "[c]over-ups that prevent a person who has been wronged from vindicating his rights violate the right of access to the courts protected by the substantive due process clause."  Estate of Smith v. Marasco, 318 F.3d 497, 511 (3d Cir. 2003) (citations omitted).  In the instant matter, Plaintiff alleges a denial of access to courts on two grounds.  First, he contends this right has been violated because of an inability to obtain, from any defense witness, the identity of a fourth person involved in the alleged assault on the night in question.  As such, according to Plaintiff, he has not been able to recover for any damages from the unidentified person.  Secondly, Plaintiff argues that the JCPD has failed to provide, through discovery, reports that were prepared by Defendants Perez, Disbrow and Sharrock.

The Court first turns to the issue of the alleged abuse of discovery.  Plaintiff contends that Plaintiff has failed to produce certain activity reports regarding the night of the incident. The

record reflects that the reports of Defendants Perez, Sharrock and Disbrow have all been lost.  In

the Estate of Smith, the Third Circuit, refusing to recognize a constitutional violation when

police officers destroyed or altered answering machine tapes, noted:

> Notwithstanding the broad formulation of the principle that a state officer's cover-up may create constitutional liability, in practice the courts have been cautious in allowing liability to be imposed on that basis. Thus, a plaintiff typically cannot recover for any cover-ups or discovery abuses after an action has been filed inasmuch as the trial court can deal with such situations in the ongoing action. In fact, if alleged cover-ups in the course of litigation are regarded as actionable under section 1983 it is foreseeable that an initial civil rights action, or indeed any action against a state or local government or its officers, will be only the first in a series of such cases. Thus, only prefiling conduct that either prevents a plaintiff from filing suit or renders the plaintiff's access to the court ineffective or meaningless constitutes a constitutional violation.

Estate of Smith, 318 F.3d at 511 (citations omitted).  Here, even if true, it cannot be said that the

loss of the incident reports of Defendants Perez, Sharrock and Disbrow prevented Plaintiff from

filing the instant suit or rendered his access to the courts ineffective or meaningless.  In short,

Plaintiff has not been effectively denied the ability to pursue his claim.

Next, Plaintiff contends he was denied access to the courts because the unknown

individual with Deitrich and Defendants Garrison and Corso, was known to at least one of these

Defendants.  However, Plaintiff proffers no evidence to support the conclusion that these

Defendants knew of the fourth person.  Moreover, the Court notes that Plaintiff has indeed sued

the "fourth person" here, by including a claim against "John Doe."  (Third Am. Compl. ¶ 47).

In view of all of the foregoing, summary judgment is granted on Plaintiff's denial of access to

courts claim.[5]

_____

[5]As already noted, Plaintiff's Fourteenth Amendment denial of medical attention and access to

(continued...)

### 3.   Civil Conspiracy

"[C]ivil conspiracy is [merely] a vehicle by which § 1983 liability may be imputed to those who have not actually performed the act denying constitutional rights." <u>PBA Local No. 38 v. Woodbridge Police Dep't</u>, 832 F. Supp. 808, 832 n. 23 (D.N.J. 1993).  As a result, "a § 1983 conspiracy claim is not actionable without an actual violation of § 1983." <u>Id.</u>   This Court has already determined that Plaintiff's § 1983 claims based on alleged denial of access to courts and denial of medical attention fail.  As there is no § 1983 liability for the foregoing claims, any civil conspiracy claims against the Jersey City Defendants related thereto, must also fail.  Therefore, summary judgment is granted on Plaintiff's civil conspiracy claim inasmuch as it relates to Plaintiff's § 1983 claims based on alleged denial of access to courts and denial of medical attention.

### 4.   Qualified Immunity

The Jersey City Defendants have also moved for summary judgment on the ground that they are qualifiedly immune from liability on Plaintiff's claims.  Qualified immunity shields state officials performing discretionary functions from suit for damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  In evaluating qualified immunity claims, a court "must first

---

[5](...continued)
courts claims are the only constitutional claims briefed by the Jersey City Defendants in connection with Plaintiff's § 1983 claims.  As already indicated, the Court dismisses these constitutional claims as applied to the Jersey City Defendants.  Consequently, summary judgment is granted to these Defendants on Plaintiff's § 1983 cause of action  – limited solely to those claims arising from the alleged violation of the aforementioned constitutional rights.  Accordingly, the Court need not reach the issue of municipal or supervisory liability under § 1983 at this juncture.

determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Conn v. Gabbert, 526 U.S. 286, 290 (1999); Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000). If the Court determines that no constitutional right would have been violated if the plaintiff's allegations were established, there is no need for any further inquiries concerning qualified immunity. Saucier v. Katz, 533 U.S. 194, 201 (2001). The grant of summary judgment is appropriate if no reasonable juror could conclude that the plaintiff's "clearly established rights were violated." Wilson, 212 F.3d at 786 (citing Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995)). If a clearly established right has been violated, it must then be considered whether in light of the circumstances known to the officer at the time, a reasonable officer would have known that his conduct violated the right; if a reasonable officer would have so known, then an officer is not entitled to immunity for such actions. Harlow, 457 U.S. at 813-20; Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000). In determining whether a government official is entitled to immunity, both the existence of a clearly established right and the objective reasonableness of the officer's actions are questions of law for the Court to decide. Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002). Indeed, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (citation omitted). However, where "historical facts" material to the issue of whether the actions of the officers were objectively reasonable, it will be an issue for the jury. Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997).

*(a)     on-duty officers responding to the scene*

<u>*Officers Karras, Kelly, Legowski and Petrovcik*</u>

These are the officers who initially responded to the scene of the incident.  Defendants
Legowski and Petrovcik were the first JCPD officers dispatched to the scene of the incident.
Defendants Karras and Kelly were dispatched about ten minutes later.  Defendant Petrovcik's
incident report indicates that upon arrival, he and Defendant Legowski saw a crowd, but no one
fighting.  (Loftis Cert. Ex. B-6). They also observed Brian McGovern yelling and not wearing a
shirt.  (Jersey City Defs.' Ex. P, Petrovcik Dep. Tr. 35).  Defendant Legowski proceeded to
handcuff Brian and place him in the back seat of the patrol car.  (<u>Id</u>.).  Defendants Legowski and
Petrovcik then began to disperse the crowd that was gathering.  During the course of dispersing
the crowd, they were approached by Plaintiff, at which point, Defendant Legowski asked
Plaintiff if he needed an ambulance.  Plaintiff declined.  It is established that an officer is entitled
to qualified immunity if, "in light of the circumstances and what was known to the officers at the
time, a reasonable officer could have believed that his or her conduct was lawful."  <u>Tofano v.
Reidel</u>, 61 F. Supp. 2d 289, 298 ( D.N.J. 1999) (citing <u>Good v. Dauphin County Social Services
for Children and Youth</u>, 891 F.2d 1087, 1092 (3d Cir. 1989)).  Based on the record before this
Court, Defendants Legowski and Petrovcik acted reasonably under the circumstances.  As such,
these Defendants are entitled to qualified immunity.

When Defendants Karras and Kelly arrived on the scene, Defendants Legowski and
Petrovcik had already arrived.  Defendant Kelly testified that there were at least fifty people
outside when they arrived in their patrol car.  (Loftis Cert. Ex. A-21 at 10).  They also observed
Brian McGovern, who was not wearing a shirt at that time.  The record indicates that thereafter,
Defendant Karras assisted Plaintiff from the ground immediately after he had allegedly being

held down by Defendants Trowbridge, Kenny, and Corso.   After Defendant Karras pulled

everyone away from Plaintiff, he took Plaintiff into the Park Tavern parking lot.  Plaintiff

contends that while in the parking lot, Defendant Garrison, in Defendant Karras' presence, held

Plaintiff up against a wall.  (Loftis Cert. Ex. A-30 at 119).  At that point, according to Plaintiff,

Defendant Garrison sought to dissuade Plaintiff from pursuing any charges against him.

Plaintiff further charges that Defendant Patricia Cassidy then appeared and took Plaintiff further

into the parking lot.  Defendant Garrison left the scene.  At that point, according to Plaintiff,

Defendant Patricia Cassidy threatened Plaintiff in connection with his employment at the HCSO.

Based on all of the foregoing, genuine issues of fact exist as to the events in the Park Tavern

parking lot.  Because these facts remain in dispute, the Court cannot determine as a matter of law

whether Karras acted in an objectively reasonable manner.  As such, the Court will deny

summary judgment on the issue of qualified immunity as to Defendant Karras.[6]  However, there

is no evidence that Defendant Kenny acted unreasonably under the circumstances, and

---

[6]Defendant Karras has moved separately for summary judgment.  In his motion, he raises the
qualified immunity defense.  Defendant Karras also moves for summary judgment on Plaintiff's
civil conspiracy claims.  A plaintiff must prove four elements in order to sustain a claim for civil
conspiracy: "(1) a combination of two or more persons; (2) a real agreement or confederation
with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be
achieved by unlawful means; and (4) proof of special damages."  Morganroth & Morganroth v.
Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 414 (3d Cir. 2003) (citing Naylor v. Harkins,
27 N.J. Super. 594 (N.J.Super.Ct.Ch.Div.1953), modified on other grounds, 32 N.J. Super. 559
(N.J.Super.Ct.App.Div.1954)); see also Weil v. Express Container Corp., 360 N.J. Super. 599
(N.J.Super.Ct.App.Div. 2003)).  This Court holds that summary judgment is granted inasmuch as
this civil conspiracy claim relies on the moving Defendants who Plaintiff claims participated in
the alleged conspiracy, but who have been dismissed based on qualified immunity.  However,
this Court's review of the facts set forth above in the body of this Opinion, indicates that there
remain genuine issues of fact which preclude this Court from granting summary judgment as to
civil conspiracy claim in connection with the non-moving Defendants.  Simply stated, given the
questions of fact, Plaintiff's civil conspiracy may proceed for now at to Defendant Karras and
the non-moving Defendants.

accordingly, summary judgment is granted in favor of Defendant Kenny on the issue qualified

immunity.

### _Officers Myers, Halter, Long and Leach_

These Defendants constitute the second group of police officers dispatched to the scene

of the incident.  Two other patrol cars had already been dispatched by the time these Defendants

were called to the scene.  Defendant Halter testified that upon his and Defendant Meyers' arrival

on the scene, he did not observe any fighting.  Defendant Halter testified as follows:

> Q:    And once you walked up to the Park Tavern - -
> A:    I didn't walk up to the Park Tavern.
> Q:    What did you do?
> A:    I walked to the corner of Communipaw and West Side.
> *                                   *                                   *
> Q:    Where did your partner go?
> A:    He was standing right next to me.
> Q:    And once you walked to the corner, what did you do?
> A:    Looked down, south, saw everything was over, and
>       returned to my radio car.
> Q:    And then what did you do?
> A:    Resumed patrol.

(Halter Dep. Tr. 34, 36).  Furthermore, these Defendants observed two other patrol cars on the

scene.  (Id. Tr. 34).  There have been no facts offered to demonstrate that Defendants Halter or

Meyers were aware that an assault on Plaintiff was taking place when they arrived on the scene.

Based on the record before this Court, Defendants Halter and Meyers reasonably believed that

no further assistance was necessary at the scene.  These Defendants are therefore entitled to

qualified immunity.

Additionally, this Court finds that Defendants Leach and Long are also entitled to

qualified immunity.  These Defendants did not even appear on the scene of the incident.  They

were advised that no further back up was necessary, and as such, stopped to aid another citizen

in a totally unrelated matter.  Leach testified:

| | |
|---|---|
| Q: | Do you recall seeing Karras and Kelly on West Side [Avenue] that night? |
| A: | No ma'am. |
| Q: | You got a dispatch from the radio saying what that night relative to the Park Tavern? |
| A: | If we were an available unit to head down that way for a street fight. |
| Q: | Did you go? |
| A: | Yes, we started heading down that way, yes. |
| Q: | What happened? |
| A: | And then another unit came on the air and said disregard any other cars. |

(Leach Dep. T18-19). Accordingly, Defendants Leach and Long are also entitled to qualified immunity.

### (b)    on-duty police officers not on the scene

Defendants Perez, Nalbach, Hussy, Sharrock, Blake and Disbrow were all on-duty police offices on the evening in question. Plaintiff alleges that they violated his civil rights by participating in a cover up to deny his access to courts. To the extent Plaintiff seeks to assert a claim against these Defendants for denial of access to court, this claim fails for the reasons already discussed, supra. It therefore cannot be said that a clearly established right has been violated. Moreover, based on the record provided to this Court, the actions of these Defendants were objectively reasonable. Accordingly, these Defendants are also entitled to qualified immunity.[7] Therefore, this Court grants summary judgment to Defendants Perez, Nalbach, Hussy, Sharrock, Blake and Disbrow on the issue of qualified immunity.

---

[7]It should be noted that, with the exception of Defendant Karras, this Court's rulings on qualified immunity as the individual JCPD Defendants are not limited solely to the constitutional claims forming the basis of the § 1983 claims discussed, supra. Rather, based on the record before this Court, these rulings apply to all claims asserted against these Defendants.

**B.**      **Section 1983: The Hudson County Defendants**

Count Three of the Third Amended Complaint asserts a § 1983 claim against the Hudson County Defendants.  This Court notes that it is somewhat difficult to ascertain precisely what claims are being asserted by Plaintiff against these Defendants.  In the Third Amended Complaint, Plaintiff states that the actions of the Hudson County Defendants are brought pursuant to the First and Fourteenth Amendments to the United States Constitution.  (Third Am. Compl. ¶ 80).  Accordingly, the Court will address the Hudson County Defendants' motion for summary judgment in this context.

**1.**      **First Amendment**

In order to obtain relief on a First Amendment retaliation claim, a plaintiff must demonstrate that: (1) he engaged in speech or an activity that involves a matter of public concern; and (2) the protected speech was a substantial or motivating factor in alleged retaliatory action.  Baldassare v. New Jersey, 250 F.3d 188, 194-95 (3d Cir. 2001).  If the plaintiff carries this burden, the burden shifts to the employer to show that it would have taken the same action even in the absence of the protected conduct.  Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000); Crane v. Yurick, 287 F. Supp. 2d 553, 559-60 (D.N.J. 2003).  An employee's speech involves a matter of public concern when it reasonably relates to "any matter of political, social or other concern to the community," Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir.1995), and it "attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials."  Connick v. Meyers, 461 U.S. 138, 148 (1983) This inquiry is a legal one, to be determined by the "content, form, and context of a given statement, as revealed by the whole record."  Id. at 147-48 & n. 7.

In this matter, it cannot be said that Plaintiff's speech involved matters of public concern. It is well-settled in the Third Circuit that "speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not." Swineford v. Snyder County Pennsylvania, 15 F.3d 1258, 1271 (3d Cir. 1994). Plaintiff's allegations concerning his employment revolve around his treatment in the workplace, including issues of overtime, off-duty pay, pension errors, promotion to Sheriff's Sergeant position, and parity pay. Although not clear from the record, Plaintiff apparently complained to the Hudson County Director of Personnel regarding some or all of these issues. Given the foregoing, this Court holds that Plaintiff's speech involved personal grievances, and not systematic wrongdoing or breaches of the public trust. Furthermore, there is no indication in the record that Plaintiff alerted the public to the conduct alleged. Plaintiff's complaints do not implicate matters of public concern, and accordingly, summary judgment on Plaintiff's First Amendment claim is granted in favor of the Hudson County Defendants.[8]

### 2.    Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The substantive component of the Due Process Clause limits what governments may do regardless of the fairness of procedures that it employs, and covers government conduct

---

[8]Since not briefed by these Defendants, the Court takes no position on any claim based on the Petition Clause of the First Amendment. To be sure, "[a]lthough a plaintiff alleging retaliation for protected speech under § 1983 must ordinarily establish that his/her speech was a matter of public concern to qualify for the protections of the First Amendment's guarantee of free expression, the same is not true where the speech itself constitutes the plaintiff's lawsuit. Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003) (citing San Filippo v. Bongiovanni, 30 F.3d 424, 434-43 (3d Cir. 1994)).

in both legislative and executive capacities."  Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000).  A protected property interest may not be taken away by the state for reasons that are "arbitrary, irrational, or tainted by improper motive."  Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 124 (3d Cir. 2000) (quoting Bello v. Walker, 840 F.2d 1124, 1129 (3d Cir. 1988)).  Whether a particular property interest falls under the scope of substantive due process protection "depends on whether that interest is 'fundamental' under the United States Constitution."  Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 140 (3d Cir. 2000).

Here, Plaintiff is presumably arguing that the Hudson County Defendants' conduct resulted in loss of Plaintiff's property interest, which include wage parity, overtime, pension, promotion to staff Sheriff's Sergeant position, and denial of transfer requests.  This Court cannot say that these claims fall within the scope of property or liberty interest afforded due process protection.  Compare Nicholas, 227 F.3d at 142 (holding that tenured public employment does not qualify as a fundamental property interest entitled to substantive due process protection).  As the Supreme Court stated:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error.... The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

Bishop v. Wood, 426 U.S. 341, 349-50 (1976).  Summary judgment is therefore granted to the Hudson County Defendants to the extent that Plaintiff asserts a substantive due process claim in connection with the issues of wage parity, pension, overtime, promotion to staff Sheriff's Sergeant position, and denial of transfer requests.

Based on the record before this Court, it also does not appear that these Defendants have violated Plaintiff's procedural due process rights. Procedural due process requires that a party be afforded notice and an opportunity to be heard "at a meaningful time and in a meaningful manner" that is "appropriate to the nature of the case." Armstrong v. Manzo, 380 U.S. 545, 552 (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). Plaintiff fails to point out to this Court any such incidents where he has been denied meaningful notice or opportunity to be heard. Therefore, any procedural due process claims also fail, and hence, summary judgment is granted to the Hudson County Defendants for any such claim.[9]

In sum, as these are the only constitutional claims briefed by the Hudson County Defendants, summary judgment is granted to these Defendants on Plaintiff's § 1983 cause of action based on these constitutional claims.[10]

## C.    Section 1985(2)

The Jersey City Defendants argue that Plaintiff's claim under 42 U.S.C. 1985(2) fails as against the uniformed police officers because neither Plaintiff nor his witnesses were deterred

---

[9]Moreover, this Court finds that the Hudson County Defendants' motion for summary judgment is also deemed unopposed inasmuch as Plaintiff, in his responsive papers, has failed to address those portions of Defendants' motion addressing Fourteenth Amendment due process. In circumstances where a nonmoving party fails to oppose the motion, Fed. R. Civ. P. 56(e) provides that the court may only grant the moving party's motion for summary judgment "if appropriate." See, e.g., Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990); see also Damiano v. Sony Music Entm't, Inc., 975 F. Supp. 623, 627 (D.N.J. 1996) (granting summary judgment because that motion considered unopposed); U.S. v. Rohm & Haas Co., 939 F. Supp. 1157, 1161 (D.N.J. 1996) (same). A moving party's motion is appropriately granted when that party is entitled to judgment as a matter of law. Anchorage Assocs., 922 F.2d at 175. When, as here, "the non-moving party fails to oppose the motion for summary judgment by written objection, memorandum, affidavits and other evidence, the Court will accept as true all material facts set forth by the moving party with appropriate record support." Carp v. Internal Revenue Serv., 2002 WL 373448, at *2 (D.N.J. Jan. 28, 2002) (citations and quotations omitted).

[10]Consequently, the Court need not reach the issue of municipal or supervisory liability under § 1983 as to these Defendants at this juncture.

from proceeding with this matter.  Section 1985(2) addresses conspiracies involving interference with witnesses in federal court proceedings and obstructing justice in state court actions in order to deny any citizen equal protection of the laws.  Section 1985(2) states that an action will lie:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

42 U.S.C. § 1985(2).  "To establish a conspiracy claim under section 1985(2), the plaintiff must show that the agreement was one "'to deter a witness by force, intimidation, or threat from attending federal court or testifying freely in a matter there pending.'"  Bowen v. Parking Authority of City of Camden, 2003 WL 22145814, *37 (D.N.J. Sept. 18. 2003) (quoting Rutledge v. Arizona Bd. of Regents, 859 F.2d 732, 735 (9th Cir. 1988)).  To succeed on a § 1985(2) claim, a plaintiff must demonstrate "(1) a conspiracy between two or more persons (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter, which (3) results in injury to the plaintiffs."  Malley-Duff & Assoc., Inc. v. Crown Life Ins. Co., 792 F.2d 341, 356 (3d Cir. 1986).

    Here, this Court finds that the evidence is insufficient to raise a genuine issue of fact as to whether on-duty uniformed officers conspired with each other to deter Plaintiff or his witnesses from testifying in this federal action.  Likewise, there has not been sufficient evidence

presented that the uniformed officers who were not on the scene, but participated in the investigation, acted to intimidate or otherwise threaten Plaintiff or his witnesses during the investigation of this matter.  Similarly, Plaintiff points to no sufficient evidence concerning a conspiracy involving the Hudson County Defendants, or any of the other moving Defendants. Accordingly, this Court will enter summary judgment on Plaintiff's § 1985(2) claim as to all Defendants herein moving on this claim.[11]

## D.    Section 1986

Section 1986 is derivative of § 1985 and, by definition, depends on a violation of section 1985. Therefore, if the "claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also."  <u>Rogin v. Bensalem Twp.</u>, 616 F.2d 680, 696 (3d Cir. 1980).  Hence, Plaintiff's § 1986 claim fails and summary judgment will be granted to all Defendants herein moving on this claim.

## E.    Tort Claims Act

Counts Five and Seven of Plaintiff's Third Amended Complaint allege intentional infliction of emotional distress and assault and battery, respectively.  The Jersey City Defendants argue that under the New Jersey Tort Claims Act, N.J.S.A. 59:10-1 to 12-3 (hereinafter the "Tort Claims Act"), Plaintiff cannot establish vicarious liability against the Jersey City Defendants. Under N.J.S.A.59:2-10, a public entity cannot be held liable for the willful misconduct of its employees.  N.J.S.A. 59:2-10 states: "A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."

---

[11]Plaintiff claims that Brian McGovern has been the subject of intimidation because comments at were made to him while exiting a bar in October 2002, and further, that his participation in his pension plan was inadvertently terminated. (PCSF ¶¶ 324, 327).  Even if this Court were to find that these actions rose to the level of intimidation actionable under § 1985(2), Plaintiff has failed to demonstrate harm.  Plaintiff has failed to show that his access to the court system, or the ability to testify by witness, was compromised.

Plaintiff concedes this point in his responsive brief.  Accordingly, summary judgment shall be granted to Jersey City and the JCPD with respect to Counts Five and Seven.

Additionally, the Jersey City Defendants also move to dismiss Count Six of the Third Amended Complaint.  The Tort Claims Act gives absolute immunity to both public entities from liability for injuries caused by a failure to enforce the law.  N.J.S.A. 59:2-4 provides: "A public entity is not liable for an injury caused by adopting or failing to adopt a law or by failing to enforce any law."  Consequently, Count Six is hereby dismissed as to Jersey City and the JCPD to the extent that Plaintiff seeks to assert a claim for failing to "uphold the laws of the State of New Jersey so that information is truthfully divulged...."  (Third Am. Compl. ¶ 92).

Finally, the Jersey City Defendants seek to dismiss the remaining claims against the public entities.  N.J.S.A.59:2-2(b) grants immunity upon the public entity where its employee is not liable.  See, e.g., Ernst v. Borough of Fort Lee, 739 F. Supp. 220, 227 (D.N.J. 1990) (holding that to the extent that police officers were immune from arrestee's emotional distress claim, borough which employed officers was also entitled to immunity).  Accordingly, the remaining claims asserted against Defendants Jersey City and the JCPD are dismissed inasmuch JCPD employees accused of negligence are not found liable.

**F.     State Constitutional Claims**

**1.     Article I, Paragraph 1**

New Jersey Constitution Article I, Paragraph 1 provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  Although the phases "equal protection" and "due process" are not expressly mentioned, the New Jersey Supreme Court has interpreted it as

protecting "against injustice and against the unequal treatment of those who should be treated alike." Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985).  As such, Article I "safeguards values like those encompassed by the principles of due process and equal protection." Id.  Here, Plaintiff argues that his equal protection and due process rights have been violated.  Based on the record, issues of fact may remain as to the numerous non-moving Defendants.  Accordingly, summary judgment is denied to the extent that liability can be imposed upon any of the remaining Jersey City Defendants based on the actions of the non-moving Defendants.  However, Plaintiff has not identified to this Court, in the Third Amended Complaint or the briefs, under what basis he seeks to hold any or all the Hudson County Defendants liable for an equal protection or due process violation under the New Jersey Constitution.  As such, their motion for summary judgment as to this claim is granted.

### 2.    Article I, Paragraph 7

Plaintiff also asserts that his rights secured by the New Jersey Constitution were also violated when he was denied the right to be free from unreasonable seizures.  Article I, Paragraph 7 of the New Jersey Constitution, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized." N.J. Const. art. 1 par. 7.  The wording of Article I, Paragraph 7 is almost identical to the Fourth Amendment of the United States Constitution, and as such, these claims are analyzed similarly.

Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied," Brower v. County of Inyo, 489 U.S. 593,

597 (1989), such that "a reasonable person would have believed that he was not free to leave."

United States v. Mendenhall, 446 U.S. 544, 554 (1980).  In the context of the Fourth

Amendment, "a person is 'seized' only when, by means of physical force or a show of authority,

his freedom of movement is restrained."  Id. at 553.  "Obviously, not all personal intercourse

between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means

of physical force or show of authority, has in some way restrained the liberty of a citizen may we

conclude that a 'seizure' has occurred."  Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968).  No seizure

has occurred, however, if "a reasonable person would feel free to disregard the police and go

about his business, or ultimately [if] a reasonable person would feel free to decline the officers'

requests or otherwise terminate the encounter."  United States v. Kim, 27 F.3d 947, 951 (3d Cir.

1994) (internal citations omitted).  Here, Plaintiff alleges four separate seizures involving

Defendants Garrison, Corso, Kenny, Trowbridge and Patricia Cassidy.  Based on the record

before this Court, a reasonable juror could find that these actions constituted an unreasonable

seizure within the meaning of the Article I, Paragraph 7 of the New Jersey Constitution.

Therefore, summary judgment is denied on this claim with respect to any remaining Jersey City

Defendants included within Count Two.

### 3.       Article I, Paragraph 18

 Article I, Paragraph 18 of the New Jersey Constitution provides: "The people have the

right freely to assemble together, to consult for the common good, to make known their opinions

to their representatives, and to petition for redress of grievances."  Plaintiff argues that his rights

to petition for redress have been violated by an alleged failure to investigate Plaintiff's charges

arising from incident at the Park Tavern.  As already discussed, however, Jersey City

Defendants Perez, Nalbach, Hussy, Sharrock, Blake and Disbrow have all been granted

qualified immunity.  Again, however, to the extent that liability can be

imposed upon any of the remaining Jersey City Defendants for any of the actions of the non-

moving Defendants, the Jersey City Defendants' motion shall be denied.  Finally, with respect to

the Hudson County Defendants, given the record before this Court, their motion is granted to the

extent that Plaintiff's claim under this provision of the New Jersey Constitution is based on an

alleged violation of Plaintiff's associational rights.[12]

**G.      Park Tavern Defendants**

In Counts Nine and Ten of the Third Amended Complaint, Plaintiff alleges that the Park

Tavern Defendants' negligent operation of the Park Tavern and serving of alcoholic beverages

on the evening in question, contributed to Plaintiff's injuries.

**1.        Negligent operation**

It is settled that the test of negligence is "'whether the reasonably prudent person at the

time and place should recognize and foresee an unusual risk or likelihood of harm or danger to

others.'"  Trentacost v. Brussel, 82 N.J. 214, 222 (N.J. 1980) (quoting Rappaport v. Nichols, 31

N.J. 188, 201 (1959)).  The existence of a duty of care is determined by the court.  Carvalho v.

Toll Bros. and Developers, 143 N.J. 565, 572 (1996).  "[B]usiness owners and landlords have a

duty to protect patrons and tenants from foreseeable criminal acts of third parties occurring on

their premises."  Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 504 (1997).   In

Cassanello v. Luddy, the court found that a tavern owner had a duty to protect patrons from the

foreseeable off-premises actions of other patrons who were known to be intoxicated, noting that

"it is 'fair and just' to place upon the tavern owner and its security person a legal duty to take

_____

[12]The Hudson County Defendants have not briefed the issue of Plaintiff's right to petition for
redress under either the United States Constitution or the New Jersey Constitution, and thus, the
Court takes no position on any such claims.

reasonable measures to safeguard the plaintiff when he leaves the premises." 302 N.J. Super.

267, 273 (App. Div. 1997) (citing Kuzmicz v. Ivy Hill Park Apartments, Inc., 147 N.J. 510, 515

(1997)). "Foreseeability does not depend on whether the exact incident or occurrences were

foreseeable. The question is whether an incident of that general nature was reasonably

foreseeable." Cassanello, 302 N.J. Super. at 275.

The record before this Court reveals that there was no security personnel present at the

Park Tavern on the evening of November 29, 1997. The Part Tavern Defendants failed to

employ security that evening, notwithstanding the fact that the "Jug-Night" event was well

known in the community, and indeed, one of the busiest nights of the year. (Loftis Cert. Ex. A-

11 at 10). Evidently, the Park Tavern was classified to permit no more that 100 persons at one

time. (Pl.'s Br. in Opp'n to Park Tavern Defs.' Mtn. at 5-6). Nonetheless, the crowd inside the

Park Tavern has been described as "shoulder to shoulder," with one witness estimating over 300

people in attendance. (PCSF ¶¶ 13-14). Viewed in its totality, the evidence submitted by

Plaintiff raises a genuine issue of material of fact as to whether the Park Tavern Defendants

breached a duty of care to Plaintiff in connection with the assault in front of the Park Tavern.

### 2.    Negligent service of alcohol

The New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, N.J.S.A.

2A:22A-1 to -7 (hereinafter "Licensed Server Liability Act" or "Act"), is a codification of the

"dram-shop" doctrine. Under the Act, a plaintiff who suffers personal injury as the result of the

negligent service of alcoholic beverages may recover if it "was proximately caused by the

negligent service of alcoholic beverages" and "was a foreseeable consequence of the negligent

service of alcoholic beverages." N.J.S.A. 2A:22A-5(a). A server of alcoholic beverages is

deemed negligent "when the server served a visibly intoxicated person...." N.J.S.A. 2A:22A-

5(b). In Steele v. Kerrigan, the New Jersey Supreme Court noted: "Without question, the

occasional assault by a belligerent drunk is a foreseeable consequence of serving alcohol. A tavern therefore may have a duty to prevent such assaults by refraining from negligent service." 148 N.J. 1, 26 (N.J. 1997)

Turning to the facts at bar, on the evening of November 26, Defendant Garrison had been in the Park Tavern for approximately four hours and had consumed "about" three Long Island Iced Teas.[13]  (Loftis Cert. Ex. A-16 at 63-64).  Plaintiff described Defendant Garrison as going "berserk," and that he smelled alcohol on Defendant Garrison's breath when he bit Plaintiff's nose.  Construing all facts in a light most favorable to Plaintiff, a reasonable juror could conclude that Defendant Garrison was visibly intoxicated at the time he exited the Park Tavern, and that service of alcohol to Defendant Garrison proximately caused Plaintiff's injuries.  As such, the Court denies the Park Tavern Defendants' motion for summary judgment.

## CONCLUSION

For the reasons set forth above, the motion for summary judgment [Docket # 115] on behalf of Defendant James Sharrock is hereby DEEMED MOOT; the motion for summary judgment [Docket # 131] on behalf of Defendant Louis Karras is hereby GRANTED in part, and DENIED in part; the motion for summary judgment [Docket # 136] on behalf of the Jersey City Defendants is GRANTED in part, and DENIED in part, as to the issues briefed by the Jersey City Defendants and decided by the Court in the instant Opinion; the motion for summary judgment [Docket # 138] filed by the Hudson County Defendants is GRANTED, as to the issues briefed by the Hudson County Defendants and decided in the instant Opinion; and the motion for summary judgment on behalf of the Park Tavern Defendants is hereby DENIED.

---

[13]A Long Island Iced Tea is typically made of five different types of alcohol, with the amount of alcohol ranging from one-half ounce to one ounce of each type of alcohol.  (Loftis Cert. Ex. C-1 ¶ 6).

Appropriate Orders accompany this Opinion.


                                          /s/ Jose L. Linares_____
DATED: December 29, 2005                  UNITED STATES DISTRICT JUDGE